2020 IL App (1st) 190452-U
No. 1-19-0452
Order filed September 14, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 09685 (03) |
| | ) | |
| JORGE MORALES, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Colleen A. Hyland, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Griffin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Affirm the circuit court's dismissal of postconviction petition at the second stage, where defendant Morales fails to make a substantial showing that trial counsel was ineffective for either failing to file a motion to suppress evidence or failing to cross-examine certain witnesses.

¶ 2    Jorge Morales challenges the second-stage dismissal of his petition for relief under the Post-Conviction Hearing Act following his conviction for possession of a controlled substance (900 grams or more of cocaine) with intent to deliver. Morales claims the trial court erred in dismissing his petition because he demonstrated a substantial denial of his constitutional right to

effective assistance of counsel. Specifically, he argues trial counsel was ineffective for (i) failing to file a motion to quash arrest and suppress evidence seized from his vehicle and (ii) failing to cross-examine certain State witnesses or ask officers whether his fingerprints were recovered from the vehicle or narcotics packaging.

¶ 3    The circuit court properly dismissed Morales's postconviction petition. The allegations in his petition and supporting documentation fail to make a substantial showing of a constitutional deprivation as a matter of law, rendering a third-stage evidentiary hearing unnecessary. We affirm.

¶ 4                                  Background

¶ 5    We detailed the offense in our opinion in *People v. Spencer*, 2016 IL App (1st) 151254, and Morales's direct appeal. *People v. Morales*, 2016 IL App (1st) 151063-U. We recite only those facts relevant to resolving this appeal.

¶ 6    The investigation leading to Morales's arrest began when Drug Enforcement Administration (DEA) agent Donald Wood received a tip from a confidential source, as reports attached to Morales's petition attest. The source advised Wood that "Kenny" (later identified as co-defendant Kenneth Spencer) was a "wholesale cocaine distributor based in the Chicago area." The source described Spencer as a "short, chubby, dark shinned [*sic*] male black" who owned a barbershop near 64th Street and Ashland Avenue where he allegedly stored and distributed cocaine. Wood learned as well that Spencer lived with his girlfriend, Nikita Reid, drove a black Audi with black rims, and used a cellphone number to facilitate drug trafficking activities. The source identified Spencer in a photograph.

¶ 7    The source also identified Spencer's cocaine supplier as an unknown "Mexican male" from whom Spencer "regularly receive[d] between 10 to 15 kilograms of cocaine at a time." The source knew little about this man beyond his being "based in the Chicago area." But the source learned

that he and Spencer were "planning to travel to Arizona in the next couple of days" to purchase 10 kilograms of cocaine for $23,000 per kilogram.

¶ 8     The DEA initiated a pen register on Spencer's cellphone.  A pen register is a surveillance device that captures the number of the cell phone making a call and the number of the phone receiving it. Agents learned through telephone analysis that the phone was at the Comfort Inn in Grants, NM. Thereafter, Wood spoke with Trooper Dena Willatto of the New Mexico State Police. Willatto went to the Comfort Inn and learned that Spencer checked in with a Hispanic male (later identified as Morales) and a white male (later identified as co-defendant Jacob Force). Willatto viewed the hotel's security video. It showed a maroon Mazda and a black Audi arriving together and Spencer, Force, and Morales at the hotel's check-in counter. Willatto obtained a copy of the video and mailed it to Wood.

¶ 9     DEA telephone analysis later showed Spencer on Interstate 17 south bound. Wood contacted agent Michael Chorzepa of the DEA's Phoenix, AR office. Chorzepa located "a maroon Mazda 3 bearing Texas registration *** and a black Audi A4 bearing Illinois registration *** in tandem south bound on I-17." The Texas plate on the Mazda was registered to Hertz Vehicles LLC and the Illinois plate on the Audi was registered to Reid. Chorzepa and other agents followed and surveilled both cars onto I-10 east bound until they got out of the Phoenix area. Along the way, Chorzepa saw Spencer, Morales, and Force stop at a Wells Fargo Bank.

¶ 10    According to DEA telephone analysis, they began their trip back to Chicago on the evening of April 22, 2012. The next day, Wood contacted Cook County Sheriff's Police Department (CCSPD) officers assigned to a local task force and "advised his group had information that two cars traveled from Chicago to Arizona to pick up drugs." He mentioned that "the same vehicles

were en-route back to Chicago and were expected to arrive April 24th, 2012 at approximately 0600 hours."

¶ 11    On April 24, 2012, the DEA and local task force officers met to plan surveillance of the cars. DEA agents and local police officers worked together to establish surveillance along I-55 south of I-80. Task Force Officer ("TFO") Craig Clark observed the Audi and Mazda "traveling north bound on I-55 in tandem with the Audi in the lead" roughly 80 miles from Chicago. Force was driving the Audi. Spencer was driving the Mazda with Morales beside him. Clark conducted "[m]obile surveillance," following the cars for about "an hour, hour and 20 minutes." He testified that the two cars, while separated by other vehicles, moved in tandem; when one moved to the left or right, the other would do the same. DEA agents "arranged for [CCSPD] Investigators to conduct traffic stops on the Audi and Mazda."

¶ 12    CCSPD Investigators Dimas Hernandez and Brian McNamara conducted a traffic stop on the Audi on I-294 southbound at 95th Street. During the stop, Force told officers he had arranged to buy the car from Spencer. Force "gave written consent to search the Audi and signed a [CCSPD] consent to search form." Hernandez contacted CCSPD K-9 Officer Jeffrey Ramos to perform a K-9 sniff, during which the dog jumped into the car through its open window, went to the rear seat, and started biting at the seam. Force was arrested. Shortly after Force was stopped, CCSPD Investigator Jeffery Lange and TFO Robert Byrnes pulled over the Mazda "regarding this on going [*sic*] investigation" and arrested both Spencer and Morales.

¶ 13    Force, Spencer, Morales, and the cars were transported to the Palos Heights Police Department. There, CCSPD Investigator Kevin O'Reilly searched the Audi and discovered "an electronic hidden compartment located in the rear driver side quarter panel." DEA agent Garrett Malloy seized six brick-shaped packages wrapped in grey tape containing cocaine from within the

compartment. He also found a receipt from the Comfort Inn. Malloy performed an inventory search of the Mazda, during which he seized multiple cellphones, a "rectangular shaped piece of sheet metal," a Comfort Inn receipt in Spencer's name, a Hertz receipt in Morales's name, a Walgreens receipt, and a Wells Fargo receipt.

¶ 14    The State charged Force, Spencer, and Morales with possession of a controlled substance (900 grams or more of cocaine) with intent to deliver. Under a plea deal, Force testified against Spencer and Morales at their joint trial. The jury convicted both Spencer and Morales. Morales was sentenced to 16 years in prison.

¶ 15    On direct appeal, Morales argued (i) the evidence was insufficient to prove his guilt beyond a reasonable doubt because it failed to establish that he actually or constructively possessed the drugs within Illinois; (ii) the trial court erred in admitting his statements to Force under the coconspirator exception to the hearsay rule; and (iii) trial counsel was ineffective for failing to file a motion to quash arrest and suppress the evidence seized from the Mazda. See *Morales*, 2016 IL App (1st) 151063-U. We affirmed, finding the evidence sufficient and his statements to Force properly admitted under the coconspirator exception to the hearsay rule. *Id.*, ¶ 3.

¶ 16    We declined, however, to rule on Morales's ineffectiveness claim, inviting him instead to raise it in a postconviction petition. *Id.*, ¶ 36. We noted that "there [was] little in the record about why the police arrested Morales," and without this information "we [could not] tell whether it was sufficient to constitute probable cause for the arrest" and "whether a motion to quash the arrest would have been successful." *Id.*

¶ 17    Morales took us up on our invitation, filing a petition for postconviction relief in which he argued trial counsel was ineffective for (i) failing to file a motion to quash arrest and to suppress the evidence recovered from his vehicle, and (ii) failing to "conduct any cross-examination of key

prosecution witnesses and failing to question any police officer regarding whether [his] fingerprints were found anywhere inside the Audi." Morales attached a copy of our order in *Morales*, 2016 IL App (1ˢᵗ) 151063-U, three DEA reports, a CCSPD report without its first page, and his affidavit. The State moved to dismiss Morales's petition, which the trial court granted.

¶ 18                                Analysis

¶ 19    Morales argues the trial court erred in dismissing his petition at the second stage because he made a substantial showing that he was denied his constitutional right to the effective assistance of counsel. We agree with the trial court that Morales failed to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984), and, as a result, failed to make a substantial showing of a constitutional deprivation. Accordingly, we affirm dismissal of his petition.

¶ 20    We apply a *de novo* standard to the dismissal of a postconviction petition without an evidentiary hearing. *People v. Sanders*, 2016 IL 118123, ¶ 31. A challenge at the second stage turns on "whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief under the [Post-Conviction Hearing Act]." *Id.* This requires us to independently assess the allegations in the petition and supporting documents. See *id.* (citing *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998)).

¶ 21                     Ineffective Assistance of Counsel

¶ 22    A defendant has the right to effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. We evaluate claims of ineffective assistance using *Strickland*'s two-pronged test. *People v. Utley*, 2019 IL App (1st) 152112, ¶ 36 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36). To prevail, a defendant must show both (i) counsel's performance was deficient and (ii) the deficient performance prejudiced defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). A

defendant's "[f]ailure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 41.

¶ 23    *Strickland* suggests that where "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed." *Strickland*, 466 U.S. at 697. To demonstrate prejudice, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). A reasonable probability "undermine[s] confidence in the outcome." *Strickland*, 466 U.S. at 694. Morales cannot establish the requisite prejudice as to either of his claims, so we need not evaluate his trial counsel's performance. See, *e.g.*, *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 45.

¶ 24         Counsel's Failure to Move to Quash Arrest and Suppress Evidence

¶ 25    Where an ineffectiveness claim arises from trial counsel's failure to file a suppression motion, *Strickland* prejudice is shown where a defendant demonstrates both (i) the merit of the unfiled motion and (ii) a reasonable probability that had the evidence been suppressed, the trial outcome would have differed. *People v. Henderson*, 2013 IL 114040, ¶ 15. Morales demonstrates neither.

¶ 26    Whether Morales's unfiled motion to quash arrest and suppress evidence seized from his car is "meritorious" depends on whether law enforcement had probable cause to arrest him and, in turn, whether the evidence seized was the fruit of an unlawful arrest. See, *e.g.*, *id.*, ¶ 16.

¶ 27    Both the United States and Illinois constitutions protect against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Officers may make warrantless arrests only where they have "reasonable grounds to believe that the person is committing or has committed an offense." *People v. Lee*, 214 Ill. 2d 476, 484 (2005) (quoting 725 ILCS 5/107-2(1)(c)

(West 2000)). Probable cause exists when "the totality of the facts and circumstances known to the officer is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." *People v. Geier*, 407 Ill. App. 3d 553, 557 (2011); see also *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (noting "[f]inely-tuned standards such as proof beyond a reasonable doubt or by the preponderance of the evidence *** have no place" in probable cause determination). Innocent explanations for some or all of the facts known to a police officer do not negate probable cause. *Id.*

¶ 28     Morales relies almost exclusively on *Lee*. We find *Lee* readily distinguishable. In *Lee*, police officers investigated a citizen complaint about "three males selling drugs at the corner." *Id.* at 478. The officers saw three men standing on the corner approach an arriving van and speak with its driver. *Id.* at 479. The officers saw no exchange of money or drugs. *Id.* They detained the men and found no weapons or contraband during a protective pat-down. *Id.* Still, they arrested them for violating a municipal drug-loitering ordinance. *Id.* A search incident to the defendant's arrest revealed six baggies of cocaine in one of his pants pockets. *Id.* at 481. While our supreme court found the information in the citizen's complaint "sufficient to justify *** a *Terry* stop," it stressed that "the officers did not conduct any further investigation to raise their reasonable suspicion to the level of probable cause for a warrantless arrest." *Id.* at 488.

¶ 29     The investigation resulting in Morales's arrest similarly began when the confidential source informed Wood of Spencer's involvement in drug trafficking. But there any conceivable analogy to *Lee* ends. We recognize Morales's concern that "the confidential source provided no specific information regarding Morales," but disagree that the source "provided no better information regarding Spencer than the police had against the arrestees in *People v. Lee*." Further, we disagree with Morales's contention that "the police here conducted no investigation of Spencer or Morales."

The police reports attached to Morales's petition reveal an investigation sufficient to confirm the information provided by the confidential source.

¶ 30    Probable cause depends on finding an informant's tip reliable. *People v. Monroy-Jaimes*, 2019 IL App (2d) 160426, ¶ 16. Reliability considers the totality of the circumstances. *Id.*; see also *Gates*, 462 U.S. 213, 239 (1983). One measure of a tip's reliability assesses whether facts learned through the police investigation independently verify a substantial part of the tip. *Id.* And an informant may demonstrate knowledge of concealed criminal activity by "accurately predict[ing] future behavior, thus indicating that the informant has 'inside information.'" *Henderson*, 2013 IL 114040, ¶ 26 (citing *Alabama v. White*, 496 U.S. 325, 332 (1990)).

¶ 31    DEA agents independently corroborated substantial parts of the tip (including the confidential source's prediction that Spencer and Morales would travel together to Arizona) through an extensive investigation involving law enforcement agencies across the country. First, they identified "Kenny" as Spencer, verified the location of the barbershop, and confirmed the cellphone number provided by the source belonged to Spencer. They initiated a pen register on Spencer's cellphone and learned he was in New Mexico at a Comfort Inn. Willatto went to the Comfort Inn and reviewed security video to corroborate that Spencer had gone to Arizona with an unidentified Hispanic male. Willatto also learned that Spencer, Morales, and Force had checked in together after arriving in a maroon Mazda and a black Audi. Chorzepa located the cars traveling through Arizona in tandem and confirmed the black Audi was registered to Reid, whom the confidential source had identified as Spencer's girlfriend.

¶ 32    DEA agents ascertained when Spencer began traveling back to Chicago by continuing to track his cellphone. Wood informed the local task force that "two vehicles traveled from Chicago to Arizona to pick up drugs" and were "en-route back to Chicago." DEA Agents met with task

force officers on the morning of the arrests to discuss their surveillance. Clark followed the cars for over an hour as they traveled in tandem northbound. DEA agents arranged for task force officers to conduct traffic stops. Force was driving the black Audi registered to Spencer's girlfriend. Spencer was driving the Mazda with Morales in the front passenger's seat.

¶ 33    Morales submits that the police "simply followed [them] for 60 miles *** to a predetermined location (to the closest highway exists to their police station) and made a warrantless arrest." This argument cherry picks information from the documents attached to Morales's petition. As we have said, DEA agents and local law enforcement officers conducted surveillance of Spencer, Morales, and Force on the very trip the confidential source had predicted. We find the source's ability to predict a cross-country trip occurring days after speaking with the DEA sufficiently corroborates the source's claims of illegality. See *White*, 496 U.S. at 332.

¶ 34    Morales emphasizes the absence of evidence that any officer "witnessed the Mazda (or any of its occupants) commit any traffic violation." He claims "Lange's testimony at trial --- that his assignment was 'to traffic stop the maroon in color Mazda' --- demonstrate[d] an intent to stop and arrest Spencer [and] Morales regardless of any observations made by the police that morning." This argument, again, ignores the information gathered before DEA agents instructed local law enforcement to stop the Audi and the Mazda.

¶ 35    To establish probable cause, officers may rely on information obtained from other officers engaged in the same investigation. *People v. Williams*, 2020 IL App (1st) 172992, ¶ 10 (citing *People v. Corral*, 147 Ill. App. 3d 668, 673 (1986)). The so-called "collective knowledge doctrine" permits an officer to "stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247,

252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232-33 (1985). "There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest— or the collective knowledge of the agency for which he works—is sufficient to constitute probable cause." *Id.*

¶ 36    The collective knowledge doctrine applies where (i) the officer taking the action objectively relies on the information received, (ii) the officer or agency providing the information knows facts sufficient to support the level of suspicion required to take the action, and (3) the action is no more intrusive than would have been permissible for the officer requesting it. *Id.* at 252-253. (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)). The officers who arrested Morales relied on information provided by the DEA (which had established probable cause for the arrest) and the stop, arrest, and subsequent search were no more intrusive than would have been permissible had the DEA, or Wood himself, operated alone.

¶ 37    Lange's testimony confirms he had been directed by the DEA to stop the maroon Mazda occupied by Spencer and Morales. Both the record and Morales's supporting documents show the DEA agents had shared enough information with local officers to impute their knowledge of additional facts and circumstances under the collective knowledge doctrine. See, *e.g.*, *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987) (applying doctrine where local officer conducting traffic stop at DEA's request knew nothing about factual basis for DEA's suspicion); *United States v. Celio*, 945 F.2d 180, 183 (7th Cir. 1991) (applying doctrine where local officers who stopped and searched vehicle at DEA's request knew only "bald assertion *** that [its agents] suspected drug trafficking."). Because the DEA agents had probable cause by the time of Morales's arrest, local law enforcement properly relied on the agents' instructions to stop the cars.

¶ 38 Morales makes no argument about the lawfulness of the search of the Mazda, assuming probable cause for his arrest and, thus, has forfeited that argument. Ill. S. Ct. Rule 341(h)(7) (eff. May 25, 2018). Because we have found probable cause to arrest, and in light of Morales's failure to challenge the search of the Mazda, we assume (without deciding) that police properly impounded the Mazda and properly conducted an inventory search. See, *e.g., People v. Nash*, 409 Ill. App. 3d 342, 347-48 (2011) (describing standards for impoundment and inventory searches). Because the arrest and search were lawful, any motion to suppress evidence would not have been meritorious and Morales's *Strickland* claim fails on that basis alone.

¶ 39 Assuming, however, that the arrest had been unlawful, Morales also argues the trial outcome would have been different because the court would have suppressed this evidence seized from the Mazda: (i) a Comfort Inn receipt from Grants, New Mexico with Spencer's name on it; (ii) a Hertz rental receipt with Morales's name on; (iii) three cell phones; (iv) a Walgreens receipt from Tucson, Arizona; and (v) a metal plate. We disagree.

¶ 40 Morales asserts that the evidence seized from the Mazda "corroborated everything Force told the jury, transforming him from a liar into someone whom the jury had no choice but to believe." To the contrary, evidence beyond that recovered from the Mazda corroborates Force's testimony. The Comfort Inn receipt from Grants, NM, bearing Spencer's name is superfluous to both (i) location information obtained by way of the pen register on Spencer's phone and (ii) the surveillance video from the hotel showing Spencer, Morales, and Force together at the check-in counter. The Walgreens receipt is superfluous to Chorzepa's having observed and followed the cars traveling in tandem through Arizona. And the metal plate is not necessary to tie the Audi to the Mazda because significant testimony showed Force, Spencer, and Morales used the cars to travel together in tandem to Arizona and back.

¶ 41 Because Morales cannot show a motion to suppress the evidence would have been granted or that a reasonable probability exists the outcome of his trial would have been different had the evidence been suppressed, he cannot satisfy his burden under *Strickland*. We reject his ineffectiveness claim.

¶ 42 Counsel's Failure to Cross-Examine Certain Witnesses

¶ 43 Morales alleges trial counsel should have cross-examined Lange, O'Reilly, and Malloy and, additionally, questioned whether Morales's fingerprints were recovered from the Audi or any narcotics packaging. We evaluate these claims of ineffective assistance against the same *Strickland* standard. *Utley*, 2019 IL App (1st) 152112, ¶ 36. Once again, we do not dwell on trial counsel's performance because Morales cannot establish the requisite prejudice. See, *e.g.*, *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 45.

¶ 44 Morales has the burden to affirmatively prove *Strickland* prejudice and show any alleged deficiency "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. To establish *Strickland* prejudice, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). Morales has not made that showing.

¶ 45 Morales claims there is "no credible explanation for the lack of any cross-examination of these key prosecution witnesses," but fails to offer any specific way in which he might have been prejudiced by this perceived deficiency. Nothing alleged in or attached to the postconviction petition suggests what the content of the desired cross-examination would be. Appellate counsel also makes no argument about the significance of the lack of fingerprint evidence in light of the substantial evidence that the group traveled to Arizona together and purchased cocaine. We have no "function or obligation…to act as an advocate or search the record for error." *People v. Jacobs*,

405 Ill. App. 3d 210, 218 (2010). *Strickland* prejudice requires a defendant show "actual prejudice, not simply speculation that [he or she] may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81; *People v. Gosier*, 165 Ill. 2d 16, 24 (1995). Without any record support, Morales speculates about cross-examination and fingerprint evidence, which dooms his ineffective assistance claim.

¶ 46    Affirmed.